STATE OF LOUISIANA

VERSUS

JONTREAL A. FISHER

NO. 19-KA-504

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-6832, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

December 23, 2020

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Robert A. Chaisson, and John J. Molaison, Jr.

**CONVICTIONS AND SENTENCES AFFIRMED ON COUNTS ONE,
THREE, FOUR, FIVE, AND SEVEN; CONVICTION AFFIRMED ON
COUNT SIX; SENTENCE VACATED AND REMANDED FOR
RESENTENCING ON COUNT SIX; CONVICTIONS AND SENTENCES
VACATED AND REMANDED ON COUNTS TWO AND EIGHT;
REMANDED FOR CORRECTION OF THE UNIFORM
COMMITMENT ORDER AND MINUTE ENTRY**
     **JGG**
     **RAC**
     **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Darren A. Allemand

COUNSEL FOR DEFENDANT/APPELLANT,
JONTREAL A. FISHER
    Prentice L. White

**GRAVOIS, J.**

Defendant, Jontreal A. Fisher, appeals eight felony convictions and sentences. On appeal, defendant challenges the denial of his motion to suppress evidence and challenges his adjudication as a second-felony offender. For the reasons that follow, we affirm defendant's convictions and sentences on counts one, three, four, five and seven; affirm defendant's conviction on count six, vacate defendant's sentence on count six and remand for resentencing; and vacate defendant's convictions and sentences on counts two and eight and remand for further proceedings. Further, we remand this matter to the trial court for correction of the Uniform Commitment Order and specified minute entry.

## PROCEDURAL HISTORY

On January 3, 2017, the Jefferson Parish District Attorney filed a bill of information charging defendant, Jontreal A. Fisher, with possession with intent to distribute marijuana in violation of La. R.S. 40:966(A) (count one), possession of cocaine (twenty-eight to two hundred grams) in violation of La. R.S. 40:967(F) (count two), possession with intent to distribute hydrocodone in violation of La. R.S. 40:967(A) (count three), possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count four), possession with intent to distribute synthetic cannabinoid (butaldehydeamidoindoles) in violation of La. R.S. 40:966(A) (count five), possession with intent to distribute fentanyl in violation of La. R.S. 40:967(A) (count six), possession with intent to distribute methamphetamine in violation of La. R.S. 40:967(A) (count seven), and simple escape in violation of La. R.S. 14:110 (count eight). Brittany Medice was charged in counts nine through thirteen with various drug offenses in the same bill of information. Counts one through seven were alleged to have occurred on November 17, 2016, and counts eight through thirteen were alleged to have

occurred on October 28, 2016. Defendant was arraigned on the same date and pled not guilty.

Defendant subsequently filed motions to suppress evidence and statement in the trial court that were denied on October 11, 2017, after a hearing. On October 18, 2017, defendant filed a motion to appoint a sanity commission. On January 10, 2018, the trial court found defendant competent to proceed.

On November 14, 2018, the State filed a superseding bill of information charging defendant with counts nine through thirteen. The State charged defendant with possession with intent to distribute synthetic cannabinoid (butaldehydeamindoles) in violation of La. R.S. 40:966(A) (count nine), possession with intent to distribute alprazolam in violation of La. R.S. 40:969(A) (count ten), possession with intent to distribute cocaine in violation of La. R.S. 40:967(A) (count eleven), possession with intent to distribute methamphetamine in violation of La. R.S. 40:967(A) (count twelve), and possession with intent to distribute tramadol in violation of La. R.S. 40:969(A) (count thirteen). On November 20, 2018, defendant was arraigned and pled not guilty. On November 26, 2018, defendant changed his plea on count eight to not guilty by reason of intoxication.

On February 12-14, 2019, the case was tried before a twelve-person jury that found defendant guilty as charged on counts one, two, four, five, six, and seven; guilty of possession of hydrocodone on count three; guilty of attempted simple escape on count eight; and not guilty on counts nine through thirteen.

On March 14, 2019, defendant filed a Motion for New Trial. On March 19, 2019, defendant filed a Motion for Post Verdict Judgment of Acquittal. Both motions were denied by the trial court on March 20, 2019. On that same date, the trial court sentenced defendant to imprisonment at hard labor for twenty years each on counts one, two, four, five, six, and seven and imprisonment at hard labor for five years on count three, with those sentences to run concurrently. The trial court

also sentenced defendant to imprisonment at hard labor for one year on count eight to be served consecutively to the other sentences. The trial court ordered the sentence on count four to be served without the benefit of parole, probation, or suspension of sentence.

On April 16, 2019, the State filed a habitual offender bill of information in connection with count four alleging defendant to be a second-felony offender. On that same date, defendant stipulated to the habitual offender bill. The trial court then vacated the original sentence on count four and resentenced defendant as a second-felony offender to imprisonment at hard labor for twenty years to run concurrently with the sentences on counts one, two, five, six, and seven. On that same date, defendant filed a Motion for Appeal that was granted. Subsequently, defendant filed a *pro se* Motion to Reconsider Sentence and a *pro se* Uniform Motion to Correct an Illegal Sentence, both of which were denied.

### NON-UNANIMOUS VERDICTS

The verdicts on counts two and eight were not unanimous. As to count two, eleven jurors voted guilty as charged to possession of cocaine, twenty-eight to two hundred grams, and one juror voted guilty of the lesser included offense of possession of cocaine. As to count eight, ten jurors voted guilty of the lesser included offense of attempted simple escape, and two jurors voted not guilty by reason of involuntary intoxication.

On April 20, 2020, the United States Supreme Court handed down its decision in *Ramos v. Louisiana*, 590 U.S. - -, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). In *Ramos*, the United States Supreme Court found that the Sixth Amendment right to a jury trial—as incorporated against the states by the Fourteenth Amendment—requires a unanimous verdict to convict a defendant of a

serious offense.[1]  The Court concluded: "There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal trials equally.  …  So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court." *Id.* at 1397.  As a result of the Supreme Court's decision in *Ramos*, defendants, who were convicted of serious offenses by non-unanimous juries and whose cases are still pending on direct review, are entitled to new trials.

In the instant case, on February 7, 2019, prior to trial, defendant filed a Motion for Unanimous Jury Verdict and Incorporated Memorandum that was denied on February 11, 2019, after a hearing.  Although defendant does not specifically challenge the jury verdict by assignment of error on appeal, the jury verdict is considered as part of an errors patent review.  *See State v. Acevedo*, 19-824 (La. 6/3/20), 296 So.3d 1019 (*per curiam*); *State v. Ford*, 19-1221 (La. 6/3/20), 296 So.3d 1026 (*per curiam*).

Defendant was charged in a thirteen-count bill of information.  At the time of the offenses, the penalties on counts one through seven and counts nine through thirteen required that the sentences be served at hard labor, and thus a jury of twelve persons was required.  *See* La. Const. Art. I, § 17; La. C.Cr.P. art. 782.  At the time of the offenses, the penalty on count eight allowed the sentence to be served with or without hard labor.  Since count eight was charged in the same bill of information as the other counts, a jury of twelve persons was required for count eight as well.  *See* La. C.Cr.P. arts. 493, 493.1, and 782.

Based on *Ramos*, considering that the instant case is still on direct review, and that the verdicts were not unanimous on counts two and eight for these serious

---

[1] For purposes of the Sixth Amendment, federal law defines petty offenses as offenses subject to imprisonment of six months or less and serious offenses as offenses subject to imprisonment over six months.  The Sixth Amendment's right to a jury trial only attaches to serious offenses.  *See generally*, *Lewis v. United States*, 518 U.S. 322, 327-28, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996); *Hill v. Louisiana*, 2013 WL 486691 (E.D. La. 2013).

offenses, we vacate the convictions and sentences on those counts, and remand this matter to the trial court for further proceedings.[2][3]

### FACTS

On October 28, 2016, Detective Ryan Rivette of the Jefferson Parish Sheriff's Office ("JPSO") and another detective were conducting surveillance and looking for narcotics activity at a house located at 707 South Bengal Road in Jefferson Parish. Detective Rivette noticed that an Infiniti M35 vehicle drove up to the house and parked in the driveway. Defendant, Jontreal Fisher, was later identified as the driver of the Infiniti. A black male came out of the house and entered the vehicle where he stayed less than thirty seconds. The vehicle then left. Detective Rivette radioed that information to assisting deputies since, based on his training and experience, he believed that "interaction" was consistent with possible street-level narcotics sales.

Approximately three seconds after he received the information from Detective Rivette, JPSO Detective Cory Himel caught up to the Infiniti. While following the vehicle, Detective Himel observed defendant commit a traffic violation. Detective Himel explained that there was a lot of traffic and that defendant was weaving in and out of lanes between vehicles without using turn signals. Detective Himel activated his lights and sirens to conduct a traffic stop, but defendant kept going. Defendant made a left turn on North Laurel, a residential area with a speed limit of twenty miles per hour, and Detective Himel clocked defendant's vehicle going above seventy miles per hour.

---

[2] On appeal, defendant raised two assignments of error. We find that neither of these assignments of error should be addressed with respect to counts two and eight; however, they will be addressed with respect to the other counts where the verdicts were unanimous.

[3] Regarding counts two and eight, our review of the record under *State v. Raymo*, 419 So.2d 858, 861 (La. 1982), reflects that defendant/appellant is not entitled to an acquittal under the standards of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981); and *State v. Hearold*, 603 So.2d 731, 734 (La. 1992).

As Detective Himel continued to chase the vehicle, defendant lost control of the vehicle and hit a guardrail by a canal. Immediately thereafter, defendant backed up and hit Detective Himel's vehicle, after which defendant went forward and continued driving. After turning right onto David Drive, defendant pulled over to the far left lane close to the Entergy substation. Detective Himel then observed an object being thrown from the sunroof, which then flew over the fence. Detective Rivette later went to the Entergy substation and found a handgun with one round in the chamber, a magazine, and bullets.

Defendant continued on, traveling south in the northbound lane, and went to the CVS Pharmacy at the corner of Airline and David Drive. Defendant subsequently drove through the parking lot of the CVS Pharmacy going the wrong way, circled around the building, and came back to where he was facing Airline. Detective Himel testified that he then saw a large zippered black bag being thrown out of the sunroof, which landed behind the Infiniti and in front of him. JPSO Detective Patrick Evans later retrieved the black bag.[4]

Defendant then turned right onto Airline, but there was a lot of traffic so he pulled onto the shoulder. However, defendant's route became blocked when another driver pulled in front of him. Defendant jumped out of his vehicle, leaving the driver-side door open, and ran westbound across David Drive along Airline. When defendant left his vehicle, it was in gear, and it rolled into the vehicle in front of him. Detective Himel exited his car and chased defendant to a chain-link fence near a building and an alleyway where the detective apprehended him. Sergeant John Picassio arrived and assisted Detective Himel in putting handcuffs

---

[4] Detective Himel testified that the contents of that bag included Ms. Medice's driver's license, credit cards, and a tampon. Also found in the bag were $887 in United States currency, four clear plastic bags containing illegal narcotics, and a hand-rolled cigar containing marijuana. He further testified that they searched defendant's vehicle and found on the floorboard on the driver's side a hand-rolled cigar containing marijuana, a black Alcatel phone, and a black LG phone next to the cigar. They also found identification cards in the sunglasses compartment.

on defendant. Detective Himel told defendant he was under arrest and conducted a search incidental to arrest, during which he found approximately $320 in cash and an Alcatel cell phone in defendant's right front pants pocket. Brittany Medice, the front-seat passenger, was also arrested, and her Apple iPhone was seized.

Detective Evans assumed custody of defendant after he was handcuffed, and defendant was transported to the CVS parking lot. He explained that Sergeant Picassio called EMS to the scene of the arrest because it looked like defendant was lethargic and about to lose consciousness. EMS determined that defendant's blood pressure was low, so they gave him Narcan, after which EMS transported defendant to the hospital where he stayed for approximately three hours. Detective Evans maintained that either he or another deputy was with defendant at all times.

Detective Evans testified that once defendant was discharged from the hospital, he told defendant that after he got dressed, they were taking him to jail. Detective Evans released one of defendant's handcuffs, so he could sign some paperwork. As his back was turned to defendant, a nurse yelled, "there he goes." Detective Evans looked to the left and saw defendant run past him and the nurses' station toward an exit door. He told defendant to stop, but defendant did not. Detective Evans chased defendant to the stairwell and down the stairs but lost sight of him when defendant crossed the street and went into the back yard of a house.

In October of 2016, Detective Himel contacted JPSO Detective Pat DiGiovanni to employ the U.S. Marshals Fugitive Task Force to locate defendant. On November 17, 2016, Detective DiGiovanni located defendant at 6301 Riverside Drive, Apartment B111, in Jefferson Parish. They established a perimeter around that location, knocked on the front door, and announced who they were, but no one came to the door. They did not detect movement inside the apartment. Detective DiGiovanni testified that they subsequently used a battering ram to breach the front door. Once they did that, they could see inside the apartment, but they could not

see anyone from their position. After the door was breached, they called out and asked defendant to come out. Detective DiGiovanni explained that a window opened up, and defendant tried to jump out of it but was "challenged" at gunpoint and ordered to go back inside and come to the front door. Defendant eventually came and met them at the front door and was placed under arrest. They asked defendant if there were any individuals or weapons inside the apartment, but he did not answer.

Detective DiGiovanni explained that they could not leave the second floor window open, that they were not sure what was going on inside, and that they did not know whether there were children inside or a stove was on, so they went inside and "clear[ed] the residence for occupants." He asserted that when they opened the door to go inside, they were immediately overcome by the "pungent" odor of burnt marijuana. He stated that there was vegetable matter in plain view in the bedroom and the bathroom, noting that marijuana was "scattered" throughout the bathroom on the counter and that a small bag of marijuana was lying next to the window that they closed.

Detective Himel testified that he obtained search warrants for the residence located at 6301 Riverside Drive, Apartment B111, and for the four cell phones that they recovered.[5] In the bathroom of the apartment, they located a pill bottle with defendant's name on it, sandwich bags, and another pill bottle with the label removed. Inside the bathroom closet, they found a blue bag containing a Springfield Army firearm,[6] money, a large array of illegal narcotics, and a digital

---

[5] JPSO Detective Solomon Burke, assigned to the digital forensics unit, and testifying as an expert in the field of mobile device forensics, performed cell phone extractions on the four cell phones recovered in the instant case. He explained that he was only able to extract information from the black Alcatel cell phone. He noted that on October 25, 2016, the following web searches were conducted on that cell phone: "What web site to get to K2;" "What web site to get to mojo synthetic;" "What's in mojo;" "How to make mojo drug;" and "What is the ingredient to get mojo and don't show up in your system."

[6] Dr. Marcela Zozaya, a DNA analyst for the JPSO, testified as an expert in the field of forensic DNA analysis. Dr. Zozaya testified that the DNA profile obtained from the Springfield Army firearm was consistent with the mixture of DNA from at least three individuals and that there were two major

scale with "residue."[7]  Clothing and shoes for an adult male were also found inside of the apartment.

JPSO Lieutenant Shane Klein, a captain in charge of the Narcotics Enforcement Division, testified as an expert in the field of narcotics quantity, packaging, pricing, paraphernalia, and distribution.  Lieutenant Klein testified that it was his opinion that the drugs found in the residence on November 17, 2016, constituted possession with the intent to distribute, noting the amount and assortment of drugs, the digital scale, the packaging material, the firearm, and the currency.  With respect to the drugs found on October 28, 2016, Lieutenant Klein concluded that although there was not a large quantity of drugs, there was an assortment of different drugs that were packaged for street-level distribution.  With respect to a subsequent February 2018 incident involving defendant, as discussed below, Lieutenant Klein believed that it looked like more of a street-level type operation.  He noted as to all three dates, there were guns, money, cell phones, and "the same drugs."

Defendant testified that on October 28, 2016, he and his girlfriend, Ms. Medice, were in his mother's vehicle, a 2008 Infiniti M35, going to the Voodoo Fest.  On the way, they stopped at his friend's house.  After they left his friend's house, they traveled up Airline, where he got into an "altercation."  He stated that he was stopped at a red light when he saw an unmarked police car with lights pull up behind him.  Because he was smoking marijuana and on parole for attempted possession of a firearm, he fled.  He later got "smashed" into the guardrail by

---

contributors and one minor contributor.  She found that defendant and Ms. Medice could not be excluded as major contributors to the DNA mixture.

[7] The State and the defense stipulated that if called to testify Brian Schulz would have testified that some of the substances found in the instant case were illegal narcotics.  The stipulation indicated that Mr. Schulz would have testified that the contraband found in the blue bag in the bathroom closet at the Riverside apartment tested positive for fentanyl, methamphetamine, synthetic cannabinoids, marijuana, hydrocodone, and cocaine.  Further, the contraband found inside the black bag thrown from the Infiniti tested positive for synthetic cannabinoids, marijuana, alprazolam, tramadol, methamphetamine, and cocaine.  The hand-rolled cigar found on the floorboard of the Infinite tested positive for marijuana.

Detective Himel. He then pulled into the CVS parking lot going the wrong way and pulled back onto Airline to escape from the police.

Defendant testified that he continued to flee until his vehicle hit the back of another vehicle, after which he jumped out of the vehicle and ran. The police officer subsequently tackled, subdued, arrested, and punched him in the side. Defendant indicated that he was out of breath and "going in and out" and did not remember being read his rights at the scene. Defendant testified that he did not throw the black bag, the gun, or anything else out of the vehicle and did not see if Ms. Medice threw anything. Defendant recalled waking up in the hospital handcuffed to a rail. He panicked and became "paranoid" because he did not know where he was. He claimed that he did not recall the police chase. When people left the room, he "snatched" his hand off the bar, took the IV out of his arm, jumped up, and ran.[8]

Defendant testified that on November 15, 2016, Gabriella Hilton gave him the key to her apartment on Riverside, which is where he stayed until he was arrested.[9] He further testified that he and Ms. Medice stayed in the apartment and slept on an air mattress in the living room. The night before he was arrested, defendant admitted that he smoked marijuana in the apartment. Defendant asserted that he was sleeping when he heard banging on the door. He ran into the kitchen

---

[8] Dr. Brobson Lutz, a physician in New Orleans who specialized in internal medicine with an emphasis in infectious diseases, testified as an expert in the field of internal medicine. Dr. Lutz asserted that defendant was given three doses of Narcan in an IV on that date. He explained that Narcan is given when someone has a decreased respiration rate and a low oxygen content in his blood. Dr. Lutz testified that defendant did not have those indicators, so it was difficult to understand why they gave it to him. He maintained that Narcan has adverse effects, both common and uncommon, including fluctuations in blood pressure, cardiac abnormalities, shortness of breath, cardiac arrest, convulsions, agitation, paranoia, violent reactions, seizures, altered mental states, hallucinations, anxiety, delusions, vomiting, nausea, and dizziness. He testified that although defendant's discharge instructions indicated that there were no adverse side effects from the medication, he believed that there was a "definite likelihood" that an adverse reaction occurred from the Narcan before defendant left the hospital.

[9] Detective Himel testified that Ms. Hilton's name was on the apartment lease, not defendant's. Ms. Hilton and defendant had three children together. She testified that she once lived at 6301 Riverside Drive, Apartment B111, but she moved out in August or September of 2016. She texted defendant and told him she was moving and that he could stay there. He never responded. When she moved out, she left the key on the counter and the door unlocked. Ms. Hilton testified that she did not know if defendant started living there.

and hid because he did not know who was knocking. Defendant realized at some point that it was the police. He explained that the police pushed the door open and called his name, after which he walked outside and was arrested.

Defendant testified that he did not have any drugs on him at that time or on October 28, 2016, when the officers tried to pull him over. He further testified that he was not selling drugs out of his vehicle on October 28, 2016, or from the apartment on November 17, 2016. Defendant asserted that he did not have a weapon on him on October 28, 2016 or on November 17, 2016. He claimed that he did not know that there was a gun or drugs in the blue bag in the bathroom closet. Defendant contended that the marijuana in the apartment belonged to Ms. Medice. Defendant admitted telling Ms. Hilton during a jailhouse phone call to say that he never lived at the Riverside apartment.

The State and the defense also stipulated that defendant was the same person who was listed in the bill of information in the 40th Judicial District Court of St. John the Baptist Parish, that defendant was convicted of possession of cocaine in violation of La. R.S. 40:967(C) in case numbers 2008CR173 and 2008CR368, that the "conviction" occurred on April 22, 2009, and that defendant received a five-year suspended sentence in the Department of Corrections with five years' active probation.

There was also testimony regarding crimes that occurred on February 1, 2018, and July 19, 2018.[10] Detective Himel testified at trial that he and other officers believed that defendant would be delivering cocaine to an address on Airline Drive near Causeway in a black Chevy Cruze on February 1, 2018, between 5:00 p.m. and 7:00 p.m. They set up surveillance and observed defendant in such a vehicle in the relevant time frame pull up to the location. During the

---

[10] On September 20, 2018, the trial court granted the State's Notices of Intent to Introduce Evidence as Well as Evidence of Defendant's Prior Crimes, Wrongs, and Bad Acts Pursuant to La. C.E. art. 404(B) regarding incidents that occurred on February 1, 2018, and July 19, 2018.

investigatory stop, defendant opened his driver-side door to exit, and Detective Himel observed a bag of crack cocaine in the door pocket. After defendant was placed under arrest, they searched the car and located inside the center console a Crown Royal bag which contained multiple types of drugs in multiple types of packaging for street-level distribution. He further testified that defendant had $2,000 in cash in his pockets when they searched him after the arrest.[11]

JPSO Detective Gavin Lyvers testified that on July 19, 2018, he was traveling northbound on Ames Boulevard in the 3600 block when he saw defendant "swerving to oncoming traffic" several times. He conducted a traffic stop, activating his emergency lights and sirens. Defendant pulled over in the parking lot at O'Reilly's Auto Parts. He explained that defendant was driving and that there was a passenger, Alexis Dillon, inside. Detective Lyvers asserted that upon approaching defendant's vehicle with a flashlight, he observed defendant's hand to be below the rear passenger floor mat in the back seat. He then observed defendant remove his hand from that position and then reach into the glove box, grab the paperwork, and exit the vehicle without being asked. The passenger also exited the vehicle immediately after defendant. Detective Lyvers asked defendant for his license, registration, and insurance, and defendant gave him his driver's license and a rental car pamphlet regarding a different car. He told defendant that he had provided the wrong paperwork. Defendant said he had it in the vehicle, but defendant refused to retrieve it and would not allow the detective to enter the vehicle. Detective Lyvers ran the license plate and learned that it was a rental car without insurance. He testified that when he stopped defendant, he detected a

---

[11] The State and the defense stipulated that if Michael Cole was called as a witness, he would qualify as an expert in the field of drug identification and analysis and would testify that the contraband found tested positive for cocaine, heroin, fentanyl, synthetic cannabinoids, marijuana, methamphetamine, and alprazolam.

marijuana odor for a brief second when the door was open. He also detected a marijuana odor emanating from defendant's person.

Detective Lyvers testified that a K9 handler and a K9 came to the scene and that the K9 handler received a positive alert in the center console. The detective searched the vehicle and found crack cocaine, marijuana, and an unknown powdered substance inside the center console.[12] He also found a firearm underneath the floor mat of the rear passenger seat in the same area where he had seen defendant reaching before he approached the vehicle. Detective Lyvers found a hand-rolled cigar in the ashtray. He arrested defendant and tried to place him in the back seat of the patrol car; however, defendant lunged away from the assisting officer. That officer was subsequently able to regain control of defendant and continued to try and put him in the car. Detective Lyvers recalled that defendant began banging his head on the frame of the patrol car and refused to enter.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, defendant argues that the trial court erred by denying his motion to suppress the evidence found in the black bag and in the Riverside apartment. He contends that the drugs taken from the black bag that was thrown from the vehicle during the chase should have been suppressed because the bag contained Ms. Medice's driver's license, and there was no connection to him. He further contends that none of the officers were able to identify the person who tossed the bag from the vehicle. Defendant also asserts that the trial court erred by denying his motion for new trial when it was evident that the jury was swayed by this illegal evidence.

Defendant further argues that the items seized as a result of the execution of a search warrant for the Riverside apartment should have been suppressed. He

---

[12] The State and the defense entered a stipulation that if Pamela Williams was called as a witness, she would qualify as an expert in the field of drug identification and analysis. She would testify that she analyzed the substances seized, and they tested positive for cocaine, heroin, fentanyl, and marijuana.

contends that the language used in the affidavit for the search warrant suggests that it was drafted after he had already been arrested and after it was already executed. Defendant points out that the affidavit states that the officers first apprehended him and then saw a plastic bag containing vegetable matter in plain view in one of the bedrooms. He contends that the probable cause for the affidavit came after the search had already been conducted. Defendant further contends that the officers did not have probable cause to enter the apartment at the time the judge signed the warrant. He asserts that La. C.Cr.P. art. 162.1 indicates that the search warrant must establish probable cause before judicial authority is given for the search or seizure. As such, defendant contends that the search of the apartment was based on a constitutionally defective search warrant. For these same reasons, defendant also asserts that the trial court erred by denying the Motion for New Trial.

On January 9, 2017, defendant filed a Motion and Incorporated Memorandum to Suppress the Evidence Seized With a Warrant, arguing that the evidence that was seized with a warrant should be suppressed because the warrant was issued without probable cause, it was based upon stale information and misrepresentations, and it was otherwise in violation of his constitutional rights. On that same date, defendant filed a Motion and Incorporated Memorandum to Suppress the Evidence Seized Without a Warrant. In that motion, defendant argued that the evidence should be suppressed because it was seized without a warrant and without reasonable suspicion or probable cause. He further argued that the seizure of the evidence was also in violation of his constitutional rights.

At the suppression hearing on October 11, 2017, similar to their testimony at trial, Detectives Himel and Rivette testified regarding the circumstances of the traffic stop, the high speed chase, defendant's arrest, the retrieval of evidence that was discarded, defendant's escape from the hospital, the protective sweep of the apartment, and the execution of the search warrant at the apartment.

Detective Himel also testified to additional details at the suppression hearing. Detective Himel testified that in the middle of November, he received a call from Detective DiGiovanni saying that they believed defendant was located at 6301 Riverside Drive, Apartment B111. They met early the next morning right outside the apartment complex. His part initially was to assist on the perimeter and let the U.S. Marshals do their job. The U.S. Marshals went to the apartment on the second floor, knocked on the front door, and announced their presence. They called for defendant, but nobody answered the door. He believed that one of the "perimeter guys" saw some movement at an open window in the apartment, "[s]o they believed somebody was in there and there was some avoidance." The U.S. Marshals then went ahead and breached the front door. He explained that when they did so, they did not go in but "just held at the door" and continued to announce and call out to defendant. Detective Himel asserted that the door was open and that after a period of time, defendant "came on out" and was placed under arrest. He stated that defendant was taken into custody "right there in the doorway."

Detective Himel also testified at the suppression hearing that they subsequently secured the residence. Noting that it was common practice, he indicated that the U.S. Marshals made entry to secure the location, close the window, and make it safe and not to investigate anything further. Detective Himel testified that they secured the residence for the safety of anyone who might be in the residence and for officer safety. After the U.S. Marshals secured the residence, they came and told him that they had observed signs of illegal narcotics activity. They escorted him inside where he observed a small bag of marijuana next to defendant's bed in the bedroom on the left side of the apartment and loose vegetable matter in the bathroom near the sink on the countertop. Detective Himel testified that he obtained a search warrant for the apartment.

He further testified that to his knowledge, at the time of the execution of the arrest warrant, prior to the officers performing a protective sweep of the apartment, there was not enough information, based upon his experience as a police officer, to apply for a search warrant for the apartment. He did not have information that there was a child, a "dangerous" person, or weapons inside of the apartment. Also, he testified that defendant did not give them consent to enter the apartment and search it.

Detective Himel also testified at the suppression hearing regarding Ms. Medice, the passenger in the vehicle that defendant was driving. Detective Himel asserted that Ms. Medice was advised of her rights, that she indicated she understood them and wanted to waive them, and that she subsequently provided a statement. He testified that in her statement, Ms. Medice said that she had no knowledge of defendant's criminal activities or whether defendant was using drugs. He testified that Ms. Medice took ownership of the black bag thrown out of the vehicle, the one hand-rolled cigar containing marijuana that was inside of the bag, and all of the non-legal items that were inside the bag except for the $887. Detective Himel testified that Ms. Medice did not take ownership of the larger amount of synthetic marijuana, nor did she take ownership of the firearm that was thrown from the vehicle and retrieved at the Entergy substation.

The Affidavit for Search and Seizure Warrant was admitted into evidence at the suppression hearing and at trial. The affidavit provides that "probable cause exists for the issuance of a search and seizure warrant authorizing the search of 6301 Riverside Drive, Apartment #B111, Metairie, La. 70003." The affidavit stated that probable cause was based on the following:

> On November 17, 2016, at approximately 0740 hours, Detective Cory Himel of the Jefferson Parish Sheriff's Office, Street Crimes Division, assisted the U.S. Marshals task force with executing an arrest warrant at 6301 Riverside Drive, Apt. #B111, Metairie, La. 70003. The Detective and U.S. Marshals were executing an arrest

warrant for Jontreal Fisher (B/M, 07/12/1990) for multiple charges to include simple escape, resisting arrest, felony drug law violations, and felony firearm violations.

Upon arrival, U.S. Marshals made contact and apprehended Mr. Fisher for the arrest warrants. Upon clearing the apartment of any possible threats, U.S. Marshal Task Force Detective Pat DiGiovanni observed, in plain view, a clear plastic bag containing vegetable matter, immediately recognized to be marijuana, resting next to the bed in the last bedroom on the right. U.S. Marshal task Force Detective DiGiovanni also observed, in plain view, loose vegetable matter scattered in bathroom on the counter top and inside the toilet. Detective Himel was escorted by Detective DiGiovanni to the locations of plain view illegal narcotics which Detective Himel observed first hand in the apartment #B111.

Detective Himel conducted a preliminary chemical field test of the loose vegetable matter observed, in plain view, resting on the bathroom countertop. At which time, the substance yielded an immediate colorimetric response testing positive for marijuana.

After hearing arguments of counsel, the trial judge denied the motion to suppress. On February 21, 2018, this Court denied defendant's writ application seeking review of the denial of the motion to suppress on the grounds that the writ application was untimely and defendant failed to comply with the Uniform Rules, Courts of Appeal, by providing the necessary documents. *See State v. Fisher*, 18-73 (La. App. 5 Cir. 2/21/18) (unpublished writ disposition). On March 1, 2018, defendant filed a writ application with this Court arguing that the previous writ application was timely and should be considered, which this Court denied as untimely on March 19, 2018. *See State v. Fisher*, 18-98 (La. App. 5 Cir. 3/19/18) (unpublished writ disposition).

On May 1, 2018, defendant filed a Motion to Reconsider Denial of Motion to Suppress Evidence in the trial court that was denied that same date. On June 13, 2018, this Court denied defendant's writ application seeking review of the denial of the motion to reconsider. This Court declined to exercise its supervisory jurisdiction because defendant had writ applications pending with the Louisiana Supreme Court regarding this Court's rulings in 18-73 and 18-98. *See State v. Fisher*, 18-290 (La. App. 5 Cir. 6/13/18) (unpublished writ disposition).

In a hearing on a motion to suppress, the defendant has the burden of proving that evidence obtained with a warrant should be suppressed, and the State has the burden of proving the admissibility of evidence seized without a warrant. La. C.Cr.P. art. 703(D); *State v. Parnell*, 07-37 (La. App. 5 Cir. 5/15/07), 960 So.2d 1091, 1097, *writ denied*, 07-1417 (La. 1/7/08), 973 So.2d 733. The trial court's denial of a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. *State v. Bellow*, 07-824 (La. App. 5 Cir. 3/11/08), 982 So.2d 826, 829. When determining whether the ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the hearing on the motion to suppress, but may also consider pertinent evidence presented at trial. *State v. Burkhalter*, 428 So.2d 449, 455 (La. 1983); *State v. Smith*, 03-786 (La. App. 5 Cir. 12/30/03), 864 So.2d 811, 818, *writs denied*, 04-380, 04-419 (La. 6/25/04), 876 So.2d 830.

***Evidence seized from bag***

Defendant first argues that the evidence seized from the black bag thrown from the vehicle on October 28, 2016, should be suppressed.

The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. *State v. Belton*, 441 So.2d 1195 (La. 1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). However, law enforcement officers are authorized by La. C.Cr.P. art. 215.1, as well as state and federal jurisprudence, to conduct investigatory stops, which allow officers to stop and interrogate a person who is reasonably suspected of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Gresham*, 97-1158 (La. App. 5 Cir. 4/15/98), 712 So.2d 946, 951, *writ denied*, 98-2259 (La. 1/15/99), 736 So.2d 200. "Reasonable suspicion" to stop is something less than probable cause and is determined under the facts and circumstances of each case by whether the officer

had sufficient facts within his knowledge to justify an infringement on the individual's right to be free from governmental interference. *State v. Sanders*, 97-892 (La. App. 5 Cir. 3/25/98), 717 So.2d 234, 240, *writ denied*, 98-1163 (La. 9/25/98), 724 So.2d 774.

The violation of a traffic regulation provides reasonable suspicion to stop a vehicle. *State v. Jones*, 01-177 (La. App. 5 Cir. 10/17/01), 800 So.2d 958, 962. The standard is purely objective and does not take into consideration the subjective beliefs or expectations of the detaining officer. *State v. Martin*, 11-160 (La. App. 5 Cir. 12/28/11), 83 So.3d 230, 237. "Although they may serve, and may often appear intended to serve, as the prelude to the investigation of much more serious offenses, even relatively minor traffic violations provide an objective basis for lawfully detaining the vehicle and its occupants." *State v. Waters*, 00-356 (La. 3/12/01), 780 So.2d 1053, 1056. Once an officer has lawfully stopped a vehicle for a routine traffic violation, he is authorized to order the driver and any passenger out of the vehicle pending completion of the stop. *State v. Gomez*, 06-417 (La. App. 5 Cir. 11/28/06), 947 So.2d 81, 85 (citing *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)). Even if the traffic stop was a pretext to investigate defendant for controlled dangerous substances, this Court has held that police officers may make an initial traffic stop after observing a traffic infraction. *State v. Williams*, 13-732 (La. App. 5 Cir. 3/26/14), 138 So.3d 727, 732.

If property is abandoned without any prior unlawful intrusion into a person's right to be free from governmental interference, that property may be lawfully seized. In such cases, there is no expectation of privacy and thus no violation of the person's custodial rights. Only when the person is actually stopped without reasonable cause or when a stop without reasonable cause is imminent, is the right to be left alone violated, thereby rendering unlawful any resultant seizure of

abandoned property. *State v. Short*, 95-742 (La. App. 5 Cir. 1/30/96), 668 So.2d 1240, 1245.

In the instant case, Detective Himel lawfully stopped defendant when he observed defendant commit a traffic violation. Defendant and Ms. Medice were both in the vehicle during the high-speed chase when the black bag was thrown, and none of the witnesses could see who threw it. Since the object was thrown out of the sunroof, either one of them could have thrown the black bag. Because the property was abandoned without any prior unlawful intrusion into defendant's right to be free from governmental interference, that property could be lawfully seized. *See Short*, *supra*. Notably, defendant was acquitted of all charges relating to the evidence seized from the bag, and he does not argue on appeal that the evidence seized from the bag led the police to other evidence. Therefore, we find that the trial court did not abuse its discretion in denying the motion to suppress evidence seized from the black bag.

### *Evidence Seized from the Apartment*

Defendant argues that the evidence seized from the apartment should be suppressed because the affidavit in support of the search warrant was based on information obtained after the officers entered the apartment without probable cause and the officers were not justified in conducting a protective sweep. The State responds that the police lawfully arrested defendant at the apartment pursuant to an arrest warrant, conducted a protective sweep as they were entitled to do, observed narcotics in plain view during the protective sweep, and then applied for, obtained, and executed a search warrant. The State points out that a full search was not conducted until after the search warrant was signed.

As a general rule, searches and seizures must be conducted pursuant to a validly executed search warrant or arrest warrant. *State v. Gaubert*, 14-396 (La. App. 5 Cir. 12/16/14), 167 So.3d 110, 114. A search warrant may be issued only

upon probable cause established to the satisfaction of a magistrate, by the affidavit of a credible person, particularly describing the person or place to be searched and the things to be seized. *Id.* Probable cause for the issuance of a search warrant exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. *Id.* The determination of probable cause does not rest on an officer's subjective beliefs or attitudes but turns on a completely objective evaluation of all the circumstances known to the officer at the time of his challenged action. *Id.* A search warrant must establish a probable continuing nexus between the place sought to be searched and the property sought to be seized. *Id.*

The task for a reviewing court is simply to ensure that under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. *State v. Payne*, 10-46 c/w 10-47 (La. App. 5 Cir. 1/25/11), 59 So.3d 1287, 1296, *writ denied*, 11-387 (La. 9/16/11), 69 So.3d 1141. Within its four corners, an affidavit must contain the facts establishing the existence of probable cause for issuing the warrant. *Id.* If the magistrate finds the affidavit sufficiently detailed and reliable to show probable cause, the reviewing court should interpret the affidavit in a realistic and common sense fashion, being aware that it is normally prepared by non-lawyer police officers in the midst and haste of a criminal investigation. *Id.* Within these guidelines, courts should strive to uphold warrants to encourage their use by police officers.[13] *Id.*

---

[13] La. C.Cr.P. art. 162 provides, in pertinent part:

A. A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant.

\*\*\*\*

A "protective sweep" is an exception to the general warrant requirement of the Fourth Amendment. A protective sweep is "a quick and limited search of the premises ... conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990). In *Buie*, the United States Supreme Court held that the Fourth Amendment to the United States Constitution permits a limited protective sweep in conjunction with an in-home arrest:

> … as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie*, 494 U.S. at 334, 110 S.Ct. at 1098.

In *United States v. Mata*, 517 F.3d 279 (5th Cir. 2008), the Court discussed three variations of post-arrest exceptions to the warrant requirement potentially applicable to protective sweeps based on *Chimel*[14] and *Buie*:

> There are three variations of the post-arrest exception potentially applicable to the officers' "safety personnel sweep." First, incident to an arrest, law enforcement officers may contemporaneously search areas within the arrestee's immediate control to prevent the destruction of evidence or procurement of a weapon. Second, officers may search areas immediately adjoining the place of arrest, such as closets and other spaces, from which a surprise attack could occur. Probable cause or reasonable suspicion is not necessary for these first two variations. Third, officers may also perform cursory "protective sweeps" of larger areas if they have articulable facts plus rational inferences that allow a reasonable officer to suspect that an individual

C. A search warrant shall particularly describe the person or place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search or seizure.

La. C.Cr.P. art. 162.1 provides, in pertinent part:

A. In addition to the provisions of Article 162, a search warrant may issue only upon probable cause established to the satisfaction of the judge by the sworn oral testimony of a credible person reciting facts establishing the cause for issuance of the warrant.

[14] *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

dangerous to the officers is within the area to be searched. [Footnotes omitted.]

*United States v. Mata*, 517 F.3d at 285.

Evidence in the open or plain view of a police officer who is legally on the premises from which he obtains the view is subject to seizure without a warrant. *State v. Nicholas*, 06-903 (La. App. 5 Cir. 4/24/07), 958 So.2d 682, 689.

In the instant case, defendant sought to suppress the evidence seized at the apartment on November 17, 2016. As was stated previously, the police seized the marijuana that was found in plain view in the bedroom and the bathroom in the apartment. They subsequently obtained a search warrant for the apartment, after which they seized pill bottles, sandwich bags, and a blue bag containing a Springfield Army firearm, money, a large array of illegal narcotics, and a digital scale with "residue." For the following reasons, we find that the seizure of the evidence in the apartment was lawful.

The arrest warrant gave the police the right to go to the apartment to arrest defendant. When the police arrived at the apartment to execute the arrest warrant, defendant did not answer the door, which led to them having to breach the front door with a battering ram. Defendant then opened a window in an attempt to escape, but the police ordered him to go to the front door. Detective Himel's testimony at the suppression hearing indicates that the police did not enter the apartment at that time but, instead, waited at the front door and called out to defendant until he "came on out" and that he was placed under arrest "right there in the doorway."

Detective Himel also testified at the suppression hearing that they subsequently went inside and secured the residence for the safety of anyone who might be in the residence and for officer safety. He explained that there was an open window in the apartment and that it was common practice to close an open

window and to make sure no one else was inside who was unable to fend for themselves. He indicated that the U.S. Marshals made entry to secure the location, to close the window, and to make sure it was safe, but not to investigate anything further. Detective DiGiovanni explained at trial that they could not leave the second floor window open, that they were not sure what was going on inside, and that they did not know whether there were children inside or if a stove was on, so they went inside and "cleared the residence for occupants."

According to *Buie*, as an incident to the arrest, the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. *See Buie*, 494 U.S. at 334, 110 S.Ct. at 1098.

Here, defendant was arrested just outside the front door or in the doorway of the apartment. Nevertheless, we find that under *Buie*, the police were justified in going into the apartment to conduct a protective sweep, even though there was no probable cause or reasonable suspicion, so they could look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched. According to *U.S. v. Mata*, the officers in the instant case were allowed, after arresting defendant, to contemporaneously search areas within defendant's immediate control to prevent the destruction of evidence or procurement of a weapon. The area inside the doorway near where defendant was arrested was within his immediate control.

Detective DiGiovanni testified at trial that when they went inside to secure the residence after the arrest, they were immediately overcome by the "pungent"

odor of burnt marijuana. We find that the officers had probable cause to enter and/or search the apartment when they detected the odor of marijuana as they opened the door to go inside to conduct the protective sweep. *See State v. Robertson*, 14-0252 (La. App. 1 Cir. 9/19/14), 2014 WL 4668685, at 5 citing *State v. Seiler*, 12-0389 (La. 5/25/12), 89 So.3d 1159, 1160-61 (*per curiam*) and *State v. Jefferson*, 13-0703 (La App. 4th Cir. 4/16/14), 140 So.3d 235, 242-43.

Once the officers went inside the apartment, they observed vegetable matter in plain view in the bedroom and the bathroom. Since the officers were legally on the premises when they saw the vegetable matter in plain view, the evidence was subject to seizure without a warrant. *See Nicholas*, *supra*. Following the seizure of the evidence in plain view (the marijuana), the officers obtained a search warrant, after which they found additional evidence (the pill bottles, the sandwich bags, and the bag containing the firearm, the narcotics, and the digital scale). We find that the facts in the search warrant affidavit clearly established probable cause that an offense or offenses had been committed and that additional evidence or contraband might be found at the place to be searched.

Defendant also asserts that the affidavit for the search warrant for the apartment indicates that the trial court approved and signed the search warrant at 1106 hours (11:06 a.m.). Defendant further asserts that the affidavit was stamped and executed at 5:33 p.m., which he alleged meant that the information in the affidavit was drafted after the warrant was executed. He states that the return on the search warrant was dated November 17, 2016, and timed at 6:25 p.m.

A review of the affidavit for the search warrant for the apartment shows that it was dated November 17, 2016, and certified by Detective Himel at 8:54 a.m. That search warrant was signed by the judge on November 17, 2016, at 11:06 a.m. The return on the search warrant was dated November 17, 2016, and the search warrant was executed at 11:06 a.m. The affidavit for the search warrant for

defendant's DNA, shows that it was dated November 17, 2016, and stamped at 17:33:51 (approximately 5:33 p.m.). The return on that search warrant was dated November 17, 2016, with a return time of "1825" (6:25 p.m.). Thus, it appears that defendant confused the two search warrants.

After defendant was arrested, the police were justified in conducting a protective sweep of the spaces immediately adjoining the place of arrest and the areas within defendant's immediate control. When the officers went inside the residence to do so, they smelled marijuana which gave them probable cause to search the residence. The police then found marijuana in plain view which they could lawfully seize. The officers then lawfully obtained a search warrant. Accordingly, we find that the trial court did not abuse its discretion by denying the motion to suppress. As such, we find that this assignment of error is without merit.[15]

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, defendant argues that he was subjected to double enhancement in his habitual offender bill proceedings. He asserts that the predicate offense used to qualify him as a habitual offender in the instant case was also used as a predicate offense for his previous conviction in 2011 for possession of contraband in a correctional facility under La. R.S. 14:402. Defendant contends that the use of one prior felony offense in two separate habitual offender bills is reversible error, and therefore, this Court should vacate the habitual offender adjudication and remand for resentencing.[16]

---

[15] Defendant also argues that the trial court erred by denying the Motion for New Trial. He did not brief this part of his assignment of error involving the denial of his Motion for New Trial. All specifications or assignments of error made to the courts of appeal must be briefed; the court may consider as abandoned any specification or assignment of error which has not been briefed. Uniform Rules–Courts of Appeal, Rule 2-12.4; *State v. Camp*, 16-473 (La. App. 5 Cir. 3/15/17), 215 So.3d 969, 973. Because defendant has failed to brief this issue, we consider it waived. Nevertheless, as stated previously, we find the trial court did not err in denying the motion to suppress.

[16] Defendant stipulated to being a second-felony offender and did not object to the habitual offender bill. Nevertheless, double enhancement claims are part of an errors patent review. *See e.g. State v. Bailey*, 97-493 (La. App. 5 Cir. 11/12/97), 703 So.2d 1325, 1331.

In the superseding bill of information, the State alleged that in count four, defendant was in possession of a firearm after having previously been convicted of the crime of possession of cocaine in violation of La. R.S. 40:967(C) under case number 2008CR173, in April 2009, in the 40th Judicial District Court. On April 16, 2019, the State filed a habitual offender bill in connection with count four alleging defendant to be a second-felony offender. The State alleged in the habitual offender bill that defendant had pled guilty to possession of contraband in a correctional center in violation of La. R.S. 14:402, on December 8, 2011, and was sentenced on that same date to serve two years and six months at hard labor in case number 11-3273 in Orleans Parish Criminal District Court.[17]

In a previous case, on May 2, 2012, the State filed a habitual offender bill alleging defendant to be a second-felony offender based on an underlying conviction of possession of contraband in a correctional center in violation of La. R.S. 14:402, on December 8, 2011, in case number 11-3273 in Jefferson Parish, the same conviction used as a predicate conviction in the instant case. The predicate offense in the May 2, 2012 habitual offender bill was possession of cocaine in violation of La. R.S. 40:967(C) in case number 2008CR173 in the 40th Judicial District Court, wherein defendant pled guilty in April 2009, and was sentenced on that same date to serve five years at hard labor, the same offense used in the possession of a firearm by a convicted felon conviction in the instant case.

In support of his double enhancement argument, defendant cites *State v. Baker*, 06-2175 (La. 10/16/07), 970 So.2d 948, *cert. denied*, 555 U.S. 830, 129 S.Ct. 39, 172 L.Ed.2d 49 (2008). In that case, the Louisiana Supreme Court held that a sentence imposed for possession of a firearm by a felon may be enhanced

---

[17] In a footnote in its brief, the State indicated that the habitual offender bill contained a typographical error in that the contraband in a correctional center charge was from Orleans Parish, when in fact, based on documents later filed into the record by defendant, that charge was actually from Jefferson Parish.

under the habitual offender law, as long as the prior felony conviction used as an element in the firearm conviction is not also used as a prior felony conviction in the habitual offender bill of information.

The instant case is distinguishable from *Baker* because in the instant case, the prior felony conviction used as an element in the felon in possession of a firearm conviction, possession of cocaine, was not also used as a prior predicate felony conviction in the habitual offender bill. Here, the 2011 conviction for contraband in a correctional center was used as a predicate in the instant case and as the underlying offense in the 2012 habitual offender bill. There is no prohibition against using the same conviction multiple times in separate habitual offender proceedings to sequentially establish defendant's habitual offender status and enhance defendant's sentence as to the new crime. *See State v. Ayche*, 07-753 (La. App. 5 Cir. 3/11/08), 978 So.2d 1143, 1154, *writs denied*, 08-2291 (La. 1/30/09), 999 So.2d 752, and 08-1115 (La. 2/13/09), 999 So.2d 1140. Therefore, we find that the trial court did not abuse its discretion by finding defendant to be a second-felony offender. This assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

### *Illegal Sentence – Count Six*

Defendant was convicted on count six of possession with intent to distribute fentanyl in violation of La. R.S. 40:967(A), and the trial court sentenced him to imprisonment at hard labor for twenty years to run concurrently with the sentences on counts one through five and seven. At the time of the offense, November 17, 2016, La. R.S. 40:967(A) provided for a penalty of imprisonment at hard labor for not more than ten years. Therefore, defendant's sentence on count six is illegal

because the twenty-year sentence on that count is higher than the maximum ten-year sentence set forth by the statute at the time of the offense.

Pursuant to La. C.Cr.P. art. 882, an appellate court may correct an illegal sentence at any time, when the exercise of sentencing discretion is not involved. *State v. Mason*, 10-284 (La. App. 5 Cir. 1/11/11), 59 So.3d 419, 430, *writ denied*, 11-306 (La. 6/24/11), 64 So.3d 216. Thus, in light of the discretion permitted by the statute, we vacate the sentence on count six and remand for resentencing.

*Mandatory Fines*

The transcript reflects that the trial court failed to impose the mandatory fines on counts one, four, and five. With respect to count one (possession with intent to distribute marijuana) and count five (possession with intent to distribute synthetic cannabinoid), the transcript shows that the trial court failed to impose the mandatory fine of not more than $50,000.00 on each count, as was required by La. R.S. 40:966(B)(3) at the time of the offenses. While this Court has held that statutes providing for a fine of "not more than" a specified amount do require a mandatory fine, this Court has also recognized that the matter is not free from doubt. *State v. Kerlec*, 06-838 (La. App. 5 Cir. 4/11/07), 957 So.2d 810, 815, *writ denied*, 07-1119 (La. 12/7/07), 969 So.2d 626. With respect to count four (possession of a firearm by a convicted felon), the transcript shows that the trial court failed to impose the mandatory fine of not less than $1,000.00 nor more than $5,000.00 as required by La. R.S. 14:95.1(B).

While an appellate court has the authority to correct an illegal sentence, this authority is permissive rather than mandatory. *See* La. C.Cr.P. art. 882. As such, we decline to disturb those sentences. *See State v. Davis*, 13-313 (La. App. 5 Cir. 10/30/13), 128 So.3d 1195, 1205, *writ denied*, 13-2748 (La. 5/16/14), 139 So.3d 1023.

### *Habitual Offender Bill – Typographical Errors*

The habitual offender bill contains two typographical errors. First, the State alleged in the habitual offender bill that defendant was convicted of the underlying felony on February 16, 2019; however, the record reflects that defendant was actually convicted on February 14, 2019. Additionally, as was discussed previously, the State alleged in the habitual offender bill that the predicate conviction was from Orleans Parish Criminal District Court, when actually it was from Jefferson Parish.

The purpose of a bill of information is to inform a defendant of the nature and cause of the accusation against him as required by the Louisiana Constitution, Article I, § 13. By way of analogy, a clerical error in the statutory citation does not require a dismissal of the bill or reversal of a conviction if the error or omission does not mislead defendant to his prejudice. La. C.Cr.P. art. 464; *State v. Anderson*, 561 So.2d 189, 191 (La. App. 5th Cir. 1990).

In the instant case, there is no indication that defendant was prejudiced by the wrong date of the underlying conviction and the wrong parish where the predicate conviction came from. As such, no corrective action is necessary.

### *Habitual Offender Bill Sentence – Restrictions*

In imposing defendant's enhanced sentence on count four to imprisonment at hard labor for twenty years, the trial court failed to state that the sentence was to be served without the benefit of probation or suspension of sentence pursuant to La. R.S 15:529.1(G).[18] The restrictions on parole eligibility imposed on habitual offender sentences under La. R.S. 15:529.1 "are those called for in the reference statute." *State v. Esteen*, 01-879 (La. App. 5 Cir. 5/15/02), 821 So.2d 60, 79 n. 24, *writ denied*, 02-1540 (La. 12/13/02), 831 So.2d 983. Pursuant to La. R.S. 14:95.1,

---

[18] The sentencing minute entry does indicate that the trial court ordered the enhanced sentence to be served without the benefit of probation or suspension of sentence. However, the transcript prevails. *State v. Lynch*, 441 So 2d 732, 734 (La. 1983).

defendant's sentence was supposed to be imposed without the benefit of parole, probation, or suspension of sentence. Thus, because defendant's underlying conviction for possession of a firearm by a convicted felon restricts parole, the trial court was required to impose the enhanced sentence without the benefit of parole, probation, or suspension of sentence. However, no corrective action is required as to defendant's enhanced sentence because under La. R.S. 15:301.1 and *State v. Williams*, 00-1725 (La. 11/28/01), 800 So.2d 790, a statute's requirement that a defendant be sentenced without the benefit of parole, probation, or suspension of sentence is self-activating.

***Uniform Commitment Order and Minute Entry – Inconsistencies***

The Uniform Commitment Order ("UCO") indicates that the dates of the offenses on counts one and five were October 28, 2016, and the dates of the offenses on counts eight, eleven, and twelve were November 17, 2016. However, the transcript reflects that the dates of the offenses on counts one and five were November 17, 2016, and the dates of the offenses on counts eight, eleven, and twelve were October 28, 2016. The UCO also reflects that defendant pled guilty on count four; however, the transcript reflects that he was found guilty. Additionally, the minute entry indicates that defendant was found guilty as charged on count three. However, the polling slips indicate that defendant was found guilty of the lesser included offense of possession of hydrocodone, and the transcript reflects that the jury's verdicts were adopted as the legal judgment of the court. The transcript prevails. *Lynch*, *supra*.

Accordingly, we remand this matter to the trial court with instructions to correct the UCO and the minute entry as noted in order to conform to the transcript. Further, we direct the Clerk of Court for the 24th Judicial District Court to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and to the Department of Corrections' legal department.

**CONCLUSION**

For the foregoing reasons, defendant's convictions and sentences on counts one, three, four, five, and seven are affirmed. Defendant's conviction on count six is affirmed; however, his sentence on count six is vacated and remanded for resentencing. Defendant's convictions and sentences on counts two and eight are vacated and remanded for further proceedings. Further, we remand for correction of the UCO and the minute entry as set forth above.

**CONVICTIONS AND SENTENCES AFFIRMED ON COUNTS ONE, THREE, FOUR, FIVE, AND SEVEN; CONVICTION AFFIRMED ON COUNT SIX; SENTENCE VACATED AND REMANDED FOR RESENTENCING ON COUNT SIX; CONVICTIONS AND SENTENCES VACATED AND REMANDED ON COUNTS TWO AND EIGHT; REMANDED FOR CORRECTION OF THE UNIFORM COMMITMENT ORDER AND MINUTE ENTRY**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 23, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 19-KA-504

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)       THOMAS J. BUTLER (APPELLEE)       NGHANA L. GAUFF (APPELLANT)
PRENTICE L. WHITE (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053